**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0545-24

STACIE DECHERT,

    Plaintiff-Appellant,

v.

TOTOWA BOARD OF
EDUCATION,

    Defendant-Respondent.

_____

Submitted January 7, 2026 – Decided March 11, 2026

Before Judges Mayer and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-2054-22.

Costello & Silverman, LLC, attorneys for appellant (Jenelle L. Hubbard, on the briefs).

Methfessel & Werbel, attorneys for respondent (William Bloom, on the brief).

PER CURIAM

Plaintiff Stacie Dechert appeals from an October 22, 2024 order granting summary judgment to defendant Totowa Board of Education and denying her cross-motion for summary judgment. We affirm.

We glean the facts from the motion record. On May 4, 2022, plaintiff was under contract with defendant for the school year September 2022 to June 2023. She was "employed as a special education aide" and "was responsible for one-on-one assistance for children between the ages of six and eight with severe disabilities."

Plaintiff had pre-existing sciatica but had no difficulty performing her duties as an aide attributable to her back problem. Plaintiff wore a back brace to school on occasion and discussed her back condition with school personnel. At her deposition, she testified "she never experienced any negative treatment . . . due to her back issues." In April 2022, plaintiff's sciatica "flare[d] up." According to plaintiff, her doctor prescribed Prednisone, Flexeril and Oxycodone. Plaintiff stated her doctor prescribed the medications "to be taken at the same time."

"On May 4, 2022, [p]laintiff's back was feeling better until she had to stop a child from leaving the room." Plaintiff testified that she "twisted" her back

and the pain became intolerable.  Plaintiff received permission to go home and retrieve her back brace.  At home, plaintiff "put on her back brace."

Plaintiff testified she spoke with her husband regarding taking her medication.  "He advised [her] to just bring" the medication with her and "suggested" it was "not a bad idea to take half."  She testified that she did not "think it was a good idea" because she did "not like to take medication," "still had a half an hour left" in the school day, and the Flexeril made her tired and she did not want to be "sleepy" while at school.  Nevertheless, she took "[a] half a Flexeril, and a half of Oxycodone."  Plaintiff explained she was not concerned that taking the medications together would affect "her ability to work at school" or cause an adverse reaction.

Shortly after returning to school, plaintiff began to experience severe stomach pain.  Plaintiff excused herself and went to the restroom.  While in the restroom, she began to experience "heat and redness."  According to plaintiff, she told a student who was also in the bathroom "to tell the teacher that she was not feeling well" and "she felt as though she could not breathe."  Plaintiff testified her body temperature was elevated and she went in and out of consciousness.

A-0545-24

When the school nurse arrived, the nurse found plaintiff on the bathroom floor with another aide. The nurse described plaintiff as "being in a . . . 'total panic,' . . . and 'just screaming.'" The nurse stated plaintiff "looked like she was having a seizure," "her eyes were rolling" and "she was sweating."

The school nurse stated plaintiff "was screaming that she had to go to the bathroom." Because plaintiff was limp, the nurse and the aide "picked her up and carried her to the toilet where she kept having massive diarrhea." According to the school nurse, a police officer administered oxygen and "considered administering Narcan."

Plaintiff was transported to the hospital via ambulance and treated for an allergic reaction. Because she felt "groggy," plaintiff did not return to work the next day. On May 6, 2022, plaintiff met with the District Superintendent, who advised plaintiff "to resign and reapply for the following school year." Plaintiff testified that she offered to provide her hospital records regarding the incident, but defendant never requested the records. Plaintiff declined to resign and she was terminated during a May 12, 2022 meeting with the District Superintendent.

The May 26, 2022 letter of termination stated:

> [A]t a regular meeting, held on Wednesday, May 25, 2022, [defendant] accepted the recommendation of the termination of your employment with the Totowa

4

School District as a [s]pecial [e]ducation [a]ide, effective Thursday, May 12, 2022.

The decision was made solely in the best interests and welfare of the students and staff in this district. We firmly believe the termination of your employment was for good cause and was unequivocally absent of any discrimination.

We initially spoke on Friday, May 6, 2022, and were of the mutual understanding that a voluntary leave through the remainder of the school year, would allow you to address any physical medical conditions and to undergo any necessary evaluations. We also had an understanding that if all conditions were satisfactorily met and you were declared fit to return, and so desired, that we would consider the possibility.

You pivoted from that position shortly after our meeting. At our second meeting, held on Thursday, May 12, 2022, you provided me a doctor's note from a primary care physician clearing you to return to work due to your back injury. There were no medical records, evaluations, or notes from any provider addressing the medical episode that occurred . . . on Wednesday, May 4, 2022, and to which by your own admission involved a reaction to mixing narcotics.

For these reasons and with the students' and staffs' best interests, safety, and welfare in mind, we firmly believe that there was good cause and justification to support our decision.

5

In August 2022, plaintiff filed a three-count complaint against defendant, alleging she "suffers from sciatica and is disabled within the meaning of that term under the" New Jersey Law Against Discrimination (LAD).[1]

After the completion of discovery, defendant moved for summary judgment and plaintiff cross-moved for summary judgment. The trial court heard the parties' arguments. During argument, among other points, plaintiff argued she suffered an allergic reaction and her allergy is "a form of disability and [he]r expert report which was attached to the motion describes exactly the nature of the allergy and how it's a cellular deficiency." Defendant countered that plaintiff's "complaint . . . stated [the] disability was sciatica" but during her deposition she "conceded that the only basis for the termination . . . was claimed allergic reaction." Defendant asserted that even considering plaintiff's fall-back position—that she suffered an allergic reaction—there was no "evidence from which a reasonable jury could conclude defendant's termination was motivated by" discrimination.

About three months after argument, the trial court placed its decision on the record. The court stated it considered the parties' written submissions and

---

[1] N.J.S.A. 10:5-1 to -50.

oral arguments. The court also considered the requirements of the summary judgment Rule 4:46-2, and the relevant law under the LAD.

The trial court found "per . . . plaintiff's complaint[,] the only alleged disability is sciatica." The court determined "plaintiff's claim fail[ed] because there [wa]s no evidence in the motion record that discriminatory animus motivated . . . defendant's decision to terminate her . . . after she had a narcotic drug-induced medical emergency." The court found "no reasonable fact finder . . . could conclude that [the decision to terminate] was driven by a discriminatory animus." Instead, the judge held defendant's "best interest . . . was the protection of faculty, staff[,] and students." The court concluded "there [was] absolutely no evidence in the motion record that . . . defendant . . . sought someone else to perform the same work."

On appeal, plaintiff contends "[t]he trial court correctly determined that [she] had met her burden under McDonnell Douglas[2] to establish a prima facie case of discrimination on her LAD claims." However, she argues "[t]he trial court erred . . . in determining that the first element of [her] prima facie case was satisfied only by establishing [her] sciatica as [her] sole disability in this case." Instead, she asserts there was "sufficient, credible evidence that [she]

---

2 McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

suffers from two separate disabilities: (1) sciatica, and (2) a severe allergy to her prescribed medication." (Emphasis omitted).

Plaintiff contends the court's error stemmed from its misreading of her complaint. She asserts her complaint "expressly set[] forth [her] allegations of disability based on her severe allergy and allergic reaction to medication." For support, plaintiff relies on the allegation in the complaint stating her diagnosis was "an allergic reaction to the combination of medi[c]ations."

Plaintiff argues "a court's review of a motion for summary judgment is not limited to the parties' pleadings," citing Rule 4:46-2(c). She contends "the trial court's [d]ecision impermissibly ignore[d] the additional competent evidence in the record . . . which confirm[ed] that [her] severe medication allergy [wa]s also a disability." As part of the additional competent evidence, plaintiff relies on her purported expert report attached to her summary judgment motion papers. Therefore, plaintiff argues she "established [a] prima facie case of disability discrimination . . . based on two separate disabilities: (1) sciatica, and (2) severe allergy to certain medications."

Next, plaintiff contends the trial court erred by misapplying the summary judgment standard. She argues the court "view[ed] multiple, disputed facts in a light most favorable to [d]efendant." She asserts the court "ultimately

credit[ed d]efendant's proffered reason that its termination decision was legitimate based on [d]efendant's concerns regarding [her] 'narcotic drug-induced medical emergency.'"

Plaintiff further argues the trial court erred in finding there was "no evidence of pretext" or that no "discriminatory animus motivated defendant's decision to terminate her." (Emphasis omitted). She contends the trial court "plainly adopt[ed d]efendant's view of what happened" by "[e]ssentially . . . quot[ing] . . . [d]efendant's reply brief."

We review a trial court's order granting or denying "a motion for summary judgment de novo, applying the same standard used by the trial court." Samolyk v. Berthe, 251 N.J. 73, 78 (2022) (citing Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019)). The moving party must include "a concise statement of each material fact as to which the movant contends there is no genuine issue together with a citation to the portion of the motion record establishing the fact or demonstrating that it is uncontroverted." R. 4:46-2(a). In response, "[a] party opposing the motion shall file a responding statement either admitting or disputing each of the facts in the movant's statement." R. 4:46-2(b). If the opposing party does not "specifically dispute[]" in the same

manner as required by paragraph (a), "all [the] material facts in the movant's statement which are sufficiently supported will be deemed admitted." Ibid.

A court must grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c).

Under the Rule, "[a]n issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." Ibid. Thus, when reviewing the grant of a motion for summary judgment, the appellate court considers "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

The LAD provides that "[i]t shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or an employer, because

of the . . . disability . . . to discharge . . . from employment such individual." N.J.S.A. 10:5-12(a).  See also Grande v. St. Clare's Health Sys., 230 N.J. 1, 16 (2017) (noting that "the LAD prohibits an employer from terminating a disabled employee because of her disability").

Moreover, "[a]n employee perceived to have a disability is protected under the LAD to the same extent as someone who is disabled."  Guzman v. M. Teixeira Int'l, Inc., 476 N.J. Super. 64, 70 (App. Div. 2023).  "LAD claims based upon a perceived disability still require 'a perceived characteristic that, if genuine, would qualify a person for the protections of the LAD.'"  Ibid. (quoting Dickson v. Cmty. Bus Lines, Inc., 458 N.J. Super. 522, 532 (App. Div. 2019)) (internal quotation marks omitted).

Under the LAD a

> "[d]isability" means physical or sensory disability, infirmity, malformation, or disfigurement which is caused by bodily injury, birth defect, or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impairment, deafness or hearing impairment, muteness or speech impairment, or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological, or developmental disability, including autism spectrum disorders, resulting from anatomical, psychological, physiological, or neurological conditions which prevents the typical exercise of any

11

bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Disability shall also mean AIDS or HIV infection.

[N.J.S.A. 10:5-5(q).]

A "person claiming to be aggrieved by an unlawful employment practice or an unlawful discrimination . . . may initiate suit in [the] Superior Court." N.J.S.A. 10:5-13(a)(2). "An employee who commences an action seeking redress for an alleged violation of the LAD 'may attempt to prove employment discrimination by either direct or circumstantial evidence.'" Smith v. Millville Rescue Squad, 225 N.J. 373, 394 (2016) (quoting Bergen Com. Bank v. Sisler, 157 N.J. 188, 208 (1999)). "A case established through direct evidence is also referred to as either a 'Price Waterhouse case' or a 'mixed-motive case.'" Smith, 225 N.J. at 394 n.3 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277-78 (1989) (O'Connor, J., concurring)). Plaintiff did not allege a Price Waterhouse case.

Therefore, she must establish her case "through circumstantial evidence . . . referred to as a 'McDonnell Douglas case' or a 'pretext case.'" Ibid. (citing McDonnell Douglas, 411 U.S. at 802). The McDonnell Douglas framework "suppl[ies] a tool for assessing claims, typically at summary judgment."

12

Comcast Corp. v. Nat'l Ass'n of Afr. Am. Owned Media, 589 U.S. 327, 340 (2020).

Applying the McDonnell Douglas

> framework, a plaintiff must first prove a prima facie case of discrimination. Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492 (1982). To do so, a plaintiff must show that he or she (1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified; (3) was not hired or was terminated from that position; and that (4) the employer sought to, or did fill the position with a similarly-qualified person. Ibid. The establishment of a prima facie case gives rise to a presumption of discrimination. Id. at 493.
>
> Once that threshold has been met, the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Ibid. After the employer does so, the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination. Ibid. To prove pretext, however, a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent. Erickson v. Marsh & McLennan Co. Inc., 117 N.J. 539, 561 (1990) (holding that an "employee can be fired for a false cause or no cause at all. That firing may be unfair, but it is not illegal"). Thus, under the McDonnell Douglas framework, a plaintiff retains the ultimate burden of persuasion at all times; only the burden of production shifts. Andersen, 89 N.J. at 493.

A-0545-24

[Viscik v. Fowler Equip. Co., 173 N.J. 1, 14 (2002) (citations reformatted).]

"The McDonnell Douglas framework utilizes both subjective and objective employer standards at different stages of its analysis." Id. at 21. "[I]n addressing the second prong of McDonnell Douglas . . . the standard is an objective one: was the employee meeting the employer's legitimate or reasonable expectations." Ibid. (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 600 (1988)). Additionally,

> in answering the overarching question whether the employer's proffered non-discriminatory reason for discharge was pretextual, the fact-finder is required to consider the employee's performance or other qualities in light of the employer's subjective standards . . . . In that respect, the employer's subjective decision-making may be sustained even if unfair.
>
> [Ibid. (citation omitted).]

We are "cognizant of the Supreme Court's directive that the LAD 'must be sensibly and practically applied . . . [and] construed fairly and justly with due regard to the interests of all parties.'" Guzman, 476 N.J. Super. at 72 (alteration in original) (quoting Andersen, 89 N.J. at 496) (internal quotation marks omitted).

While the LAD shall be liberally construed to protect against discrimination, N.J.S.A. 10:5-3, the "LAD acknowledges the right of employers

14

to manage their businesses as they see fit." Viscik, 173 N.J. at 13. Thus, employers have "the right to fire . . . employees who are unable to perform the job, 'whether because they are generally unqualified or because they have a handicap that in fact impedes job performance.'" Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 374 (1988) (quoting Andersen, 89 N.J. at 496). The LAD does not "prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards," N.J.S.A. 10:5-2.1; and is "construed to prohibit any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A. 10:5-4.1 (emphasis added). It is "clear that an employer may terminate a disabled employee where continued employment 'would be hazardous to the safety or health of [the employee], other employees, clients or customers.'" Grande, 230 N.J. at 19-20 (alteration in original) (quoting N.J.A.C. 13:13-2.8(a)(2))

Applying this well-established law, we conclude summary judgment was properly granted to defendant and denied to plaintiff. First, as to sciatica, there is no evidence plaintiff was terminated because of this condition. Instead, according to plaintiff, she had sciatica as a pre-existing condition; had no issues performing her duties because of the condition; was permitted to wear her back brace at work; and "never experienced any negative treatment . . . due to her back issues." Under these circumstances, plaintiff failed to establish that defendant's reason for termination was pretextual and instead actually based on a discriminatory animus related to her sciatica.

Second, we consider the allegation that plaintiff's allergic reaction constituted a disability under the LAD and defendant's discriminatory animus toward the disability was the reason for her termination. As the trial court found, plaintiff's complaint only alleged sciatica as her identified disability. Generally, parties may not use a motion for summary judgment to introduce new claims or theories. See Stewart v. N.J. Tpk. Auth./Garden State Parkway, 249 N.J. 642, 648 (2022) (noting a "new theory should not have been considered given its late presentation"). Nevertheless, the court considered plaintiff's disability was an allergic reaction to medication. Thus, for the sake of completeness, we consider the allegation, as well.

16

Plaintiff's purported expert opined that her condition "certainly limits her ability to take certain medications in combination." In Guzman,

> [w]e recognize[d] the term "disability" in the LAD "is not restricted to 'severe' or 'immutable' disabilities," Viscik, 173 N.J. at 16 . . . or to "[disabling] condition[s that] result in substantial limitation of a major life activity," Tynan v. Vicinage 13 of the Superior Ct., 351 N.J. Super. 385, 398 (App. Div. 2002), and that courts "adhere to a broad interpretation of the [LAD] as it applies to the physically [disabled]," Andersen, 89 N.J. at 496.
>
> [476 N.J. Super. at 72 (all but first and second alterations in original) (citations reformatted).]

However, applying the LAD "sensibly and practically," we also stated "[n]ot every illness will constitute a disability under the LAD." Ibid. Here, while we do not minimize the severity of plaintiff's adverse reaction to her medications, her apparent one-time medication reaction failed to constitute a disability under the LAD.

Moreover, even if plaintiff's allergy constituted a disability, and it is not, plaintiff failed to establish that defendant's reasons for her termination—"the students' and staffs' best interests, safety, and welfare"—was pretextual and based on an actual discriminatory animus toward her allergy.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-0545-24